IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 1, 2021

## IN RE TERRY E. ET AL.

**Appeal from the Juvenile Court for Grainger County**
**No. 2019JV29          Steven Lane Wolfenbarger, Judge**

_____

### No. E2020-01572-COA-R3-PT
_____

This is a termination of parental rights case. The trial court concluded that multiple grounds for terminating Mother's parental rights existed and that termination was in the Children's best interests. Discerning no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded.**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which ANDY D. BENNETT and JOHN W. MCCLARTY, JJ., joined.

Jordan Long, Tazewell, Tennessee, for the appellant, Billie E.

Herbert H. Slatery, III, Attorney General and Reporter, and Kathryn A. Baker, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### BACKGROUND AND PROCEDURAL HISTORY

Billie E. ("Mother") is the mother of Terry E. and Mary E. (collectively, "the Children"), who are the children at issue in this appeal.[1] The Tennessee Department of Children's Services ("the Department") initially became involved with the family in the spring of 2019 following a referral that alleged drug exposure and environmental neglect. According to a filed petition in which the Department sought a finding that the Children were dependent and neglected, the allegations of which Mother stipulated to, Mother tested positive for amphetamine and methamphetamine after a Department employee obtained

---

[1] This Court has a policy of protecting children's identities in parental termination cases by initializing the last names of certain persons discussed in termination opinions.

consent for a urine drug screen. Mother specifically admitted to inhaling methamphetamine one to two days prior to the test. Mother's husband ("Stepfather") also tested positive for amphetamine and methamphetamine.

The Grainger County Juvenile Court ("the trial court") subsequently entered a protective custody order awarding temporary legal custody of the Children to the Department, and pursuant to the trial court's "Adjudicatory and Permanency Hearing Order" entered on May 7, 2019, the Children were found to be dependent and neglected.

Once the Children were in the Department's custody, a number of family permanency plans were created. The first permanency plan, which was created on April 25, 2019, contained multiple responsibilities for Mother. In relevant part, the plan required her to: (1) have a minimum of two supervised visits per month with the Children; (2) complete a mental health assessment and follow all recommendations; (3) provide the Department with documentation of attendance to her mental health appointments; (4) schedule an alcohol and drug assessment and follow all recommendations; (5) not use any illegal substances; (6) submit to and have clean random drug screens; (7) provide the Department with documentation of attendance to alcohol and drug treatment appointments; (8) schedule a parenting assessment and follow all recommendations; (9) show the ability to utilize positive parenting skills through supervised visitations; (10) provide the Department with a copy of her social security award letter or some proof of social security income; (11) obtain and maintain safe and stable housing sufficient to meet the needs of herself and the Children; (12) not allow anyone in her home that is under the influence of illegal substances; (13) ensure that the Children have bedrooms and beds in her home and that the home is clean and tidy; (14) utilize public transportation such as Ethra and provide the Department with a copy of Stepfather's license, registration, and insurance; (15) follow the law and not obtain any new legal issues and comply with any and all probation/parole requirements she may have; and (16) participate in the Children's school meetings and attend all scheduled medical appointments. Subsequent permanency plans contained substantially similar requirements.[2]

Initially, Mother appeared to make some progress in the wake of the Children's removal. The trial court's May 7, 2019 adjudicatory order reflected that Mother was "working on the plan," although "not in substantial compliance," and at the later termination trial of this matter, a foster care worker testified that Mother "did really well" the first few months. However, the same foster care worker observed that there had been a drop-off after about two months when Mother failed a drug screen. Concerns about Mother's drug use, and that of Stepfather, persisted throughout the course of the case. Indeed, among other things, the record is replete with evidence that Mother and Stepfather did not show up for multiple drug screens and tested positive on a number of occasions

---

[2] We also note that the amended permanency plans required Mother to "provide rent receipts to the department to indicate residential stability."

when tests were able to be conducted. Concerns also existed throughout pertaining to Mother's need to establish appropriate housing for the Children.

On May 18, 2020, the Department filed a petition to terminate Mother's parental rights to the Children. In addition to asserting that several grounds justified termination, the Department contended that it was in the Children's best interests for the termination to be granted because, among other things, Mother had not made changes in her conduct or circumstances that would make it safe for them to return home. The Department specifically highlighted the fact that Mother had not addressed her drug issues and further averred that the Children wished to be adopted.

A hearing on the termination petition occurred in October 2020. The proof at trial highlighted the many areas of concern that existed as to Mother, while also addressing the Children's progress made in foster care. As to this latter subject, testimony from the Children's case manager indicated that the Children had "flourished" in their foster home, and the Children's foster mother expressed a desire for the court to make the Children available for adoption. She stated that she and her husband were bonded with the Children, and she expressed concern that the Children would regress if they were removed from her home. According to her, Terry had expressed a desire that he "doesn't really want to go home," and Mary had "pretty much said the same thing."

On November 2, 2020, the trial court entered an order terminating Mother's parental rights. Four grounds were specifically identified as pertaining to Mother by clear and convincing evidence: (1) abandonment by failure to provide a suitable home; (2) substantial noncompliance with permanency plan; (3) persistent conditions; and (4) failure to manifest an ability and willingness to personally assume custody or financial responsibility of the Children. The trial court also concluded that there was clear and convincing evidence that termination of Mother's parental rights was in the Children's best interests. This appeal followed.

## STANDARD OF REVIEW

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions." *In re M.L.P.*, 228 S.W.3d 139, 142 (Tenn. Ct. App. 2007). "Although this right is fundamental and superior to claims of other persons and the government, it is not absolute." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007). "It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). In Tennessee, "[w]ell-defined circumstances exist under which a parent's rights may be terminated." *In re Roger T.*, No. W2014-02184-COA-R3-PT, 2015 WL 1897696, at *6 (Tenn. Ct. App. Apr. 27, 2015). Pursuant to the Tennessee Code, parties who have standing to seek the termination of a parent's parental

rights must prove two things. They must first prove at least one of the statutory grounds for termination. *In re J.C.D.*, 254 S.W.3d at 438 (citing Tenn. Code Ann. § 36-1-113(c)(1)). Then, they must prove that termination of parental rights is in the child's best interests. *Id.* (citing Tenn. Code Ann. § 36-1-113(c)(2)).

Because the decision to terminate a parent's parental rights has "profound consequences," trial courts must apply a higher standard of proof in deciding termination cases. *In re M.L.P.*, 228 S.W.3d at 143. "To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). "Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth." *In re M.A.B.*, No. W2007-00453-COA-R3-PT, 2007 WL 2353158, at *2 (Tenn. Ct. App. Aug. 20, 2007). This heightened burden of proof "minimizes the risk of erroneous decisions." *In re M.L.P.*, 228 S.W.3d at 143.

Due to the heightened burden of proof required under the statute, we must adapt our customary standard of review. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). "First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d)." *In re M.J.B.*, 140 S.W.3d at 654. "Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights." *Id.*

## DISCUSSION

The "Statement of the Issues" section in Mother's appellate brief raises challenges to each of the grounds for termination found against her as well as the trial court's best interests determination. Of course, by mandate of the Tennessee Supreme Court, our appellate review would ordinarily reach these matters irrespective of whether Mother had specifically raised them. In order to help "ensure that fundamental parental rights are not terminated except upon sufficient proof, proper findings, and fundamentally fair procedures," we are required to review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interest. *See In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[I]n an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.").

*Failure to Establish a Suitable Home*

In its termination order, the trial court found, by clear and convincing evidence, that Mother abandoned the Children through her failure to provide a suitable home. This

particular ground of abandonment authorizes the termination of parental rights when:

> (ii)(*a*) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child,[3] and the child was placed in the custody of the department or a licensed child-placing agency;
> (*b*) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
> (*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii).

We agree with the trial court that this ground was sufficiently established. The Children were removed at the beginning of April 2019 when temporary custody was awarded to the Department. The record also contains an order wherein the court found that, concerning the period prior to removal, "based on an assessment of the family and the children's circumstances, it was reasonable to make no effort to maintain the children in the home."

The remaining considerations of the statutory ground, concerning the period

---

[3] Whereas the statute now clearly ties this ground to an order of removal entered "at any stage of proceedings *in which a petition has been filed* in the juvenile court *alleging* that a child is a dependent and neglected child," Tenn. Code Ann. § 36-1-102(1)(A)(ii) (emphases added), the statute previously read to require that the child be removed "as the result of a petition filed in the juvenile court in which the child *was found* to be a dependent and neglected child." *See In re Kaden W.*, No. E2018-00983-COA-R3-PT, 2019 WL 2093317, at *6 (Tenn. Ct. App. May 13, 2019) (emphasis added) (quoting Tenn. Code Ann. § 36-1-102(1)(A)(ii)(2017)).

subsequent to removal, are what Mother takes particular issue with in her brief on appeal. Indeed, with respect to the inquiry required by Tennessee Code Annotated section 36-1-102(1)(A)(ii)(*c*), i.e., whether the Department made reasonable efforts to assist her in establishing a suitable home for a period of four months following the Children's removal and whether she made reciprocal efforts to establish the same, Mother specifically states that she "has made reciprocal reasonable effort[s] to establish a suitable home." In doing so, she challenges the trial court's findings that she had not made reasonable efforts and that the Department's efforts to assist Mother had been "equal to, or exceed[ed], the efforts of . . . Mother." Of note, the trial court specifically found that the Department made reasonable efforts to assist Mother to provide a suitable home both in the four months following removal and "during the entirety of the case."

As explained *infra*, the evidence supports the conclusion that the Department offered significant support to Mother, not only in terms of guidance as to what needed to be improved in her home, but also in relation to improving Mother's ability to serve as a caregiver to the Children. The Department's efforts as to this latter consideration are not irrelevant to our discussion of this ground, because "the concept of a suitable home encompasses more than a proper physical location." *In re Dominic B.*, No. E2020-01102-COA-R3-PT, 2021 WL 774185, at *6 (Tenn. Ct. App. Mar. 1, 2021) (citing *In re Navada N.*, 498 S.W.3d 579, 595 (Tenn. Ct. App. 2016)). Indeed, "the establishment of a suitable home entails considerations as to whether '[a]ppropriate care and attention' are given to the child at issue." *Id.* (quoting *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016)).

Samara Dixon, the Children's foster care worker upon their removal and until August 2019, testified to her various efforts in engaging and working with Mother. These efforts included holding Child and Family Team Meetings, securing approval for a combination parenting assessment/mental assessment/alcohol and drug assessment, informing Mother of the Children's appointments, going over the steps of the permanency plan with Mother, attempting to provide drug screens for Mother, going over the recommendations from the parenting assessment with Mother, giving information to Mother in relation to free parenting classes, driving Mother to visitation, arranging for in-home parenting services, and visiting Mother's home.

As for Mother's specific home situation, Ms. Dixon testified as follows:

> They were renting a house out at Bean Station. It was -- it's kind of hard to explain. It's a one bedroom, but it's like two small rooms that you have to go through one small room to get to the other small room. So technically it's a one bedroom.

Ms. Dixon stated that the bedroom was not set up for the Children and was "in really poor condition." She testified that "[t]hey had a mattress in the living room that they were

- 6 -

sleeping on" but that they "didn't have any beds up," "nothing for the children." The bedroom area reportedly "just had stuff throughout in there."

Ms. Dixon testified that she talked to Mother about this and offered support and discussed the issues that needed to be remedied. According to her, Mother said she was going to put beds up for the Children "and that one would have a bed in one area of that room, and the other would have a bed in the other area of that room." Although Ms. Dixon stated that Mother already had the beds, they were not put together. She noted "[t]hey were propped up on the wall with all kinds of -- you couldn't really walk through it."

As for the cleanliness of the home, Ms. Dixon indicated that the room was not clean and safe. Indeed, she specifically testified on cross-examination that the home was "very, very cluttered and very dirty, and you could not move around at all in the back room." She noted the home "could have potentially been sufficient" but that it was unsafe for the Children and that she "literally had to climb over the top of stuff" to get to the back area of the home. These issues had not improved by the time Ms. Dixon ceased to be involved with the case in August 2019. Indeed, regarding a return trip to the home in that month, Ms. Dixon stated that it was "still in the same condition."

Mother failed to address these issues even as the case progressed. Maria Weir, who also made various efforts to assist Mother and who was the Children's case manager since the end of August 2019, testified specifically to a January 22, 2020 visit of Mother's home. In addition to noting that there was "no heat in the home," Ms. Weir testified that there were "no beds set up for the children." Mother also did not produce any rent receipts, and Ms. Weir claims that she informed Mother how such a lack of documentation was of concern to the Department. The home's floor was reportedly "bare plywood," and Ms. Weir observed at least three or four bags of trash in the living room. Ms. Weir later specifically remarked that the home had "rotting trash." According to Ms. Weir, Mother has not reported that any changes have been made at the home, and Mother's brief effectively admits that more needs to be done. Mother specifically states in her brief that she "does not currently have suitable housing." Moreover, in another place in her brief, she concedes that her home "is not finished."

Although Mother protests that she will be able to establish a suitable home in the immediate future, we find no basis to disturb the trial court's finding that her efforts to improve her home and personal condition demonstrated a lack of a concern for the Children such that it appears unlikely she will be able to provide a suitable home at an early date. Indeed, although the steps necessary to make the home physically appropriate appear to us to be relatively uncomplicated, Mother has by her own admission on appeal not yet established a suitable home despite a significant passage of time. Beyond this, however, Mother also demonstrated a lack of concern throughout the case as to her personal condition, thereby raising questions as to whether she can provide appropriate care and attention to the Children within the home. Regarding the period she had the case, Ms.

- 7 -

Dixon noted, among other things, that Mother had not completed any of the steps concerning the mental health assessment, did not comply with the random drug screens, and did not do alcohol and drug treatment. Mother's drug use was a particular point of concern in this case, as Mother had tested positive for drugs immediately prior to the Children's removal. Unfortunately, Mother missed multiple drug screens (a repeated theme throughout the case) and failed others.

Concerns with drugs and other aspects of Mother's personal condition and treatment remained even as Ms. Weir took over management of the case for the Department. Among other things, Ms. Weir testified that Mother had not completed alcohol and drug treatment. Moreover, she stated that although Mother's mental health assessment recommended that she participate in family therapy as well as individual counseling, Mother had not provided any proof of participation in counseling.

Again, although Mother professes a desire to remedy these various concerns in the near future, her demonstrated lack of effort up to this point clearly provides support for the trial court's finding that she will be unable to provide a suitable home at an early date. Respectfully, given the history of her efforts, Mother's contention to the contrary is entirely speculative. We accordingly affirm the trial court's reliance on this ground for termination.

*Substantial Noncompliance with the Permanency Plan Requirements*

Pursuant to Tennessee Code Annotated section 36-1-113(g)(2), a court may terminate a parent's parental rights when the parent is in "substantial noncompliance . . . with the statement of responsibilities in a permanency plan[.]" Tenn. Code Ann. § 36-1-113(g)(2). In conjunction with terminating a parent's parental rights under this ground, the court "must first find that the plan requirements are reasonable and related to conditions that necessitate foster care placement." *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *10 (Tenn. Ct. App. June 10, 2014). "The trial court must then find that the noncompliance is substantial." *Id.* Although the termination statute does not define what conduct constitutes substantial noncompliance, terminating parental rights under this ground "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d at 656. The significance of the noncompliance "should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. "Terms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *Id.* at 548-49. Because determining whether substantial noncompliance exists is a question of law, we review the issue de novo with no presumption of correctness. *Id.* at 548.

The trial court's termination order reflects that the court considered the responsibilities under the permanency plan reasonable to resolving the issues that prompted the Children's removal, and it determined that Mother had been "substantially

noncompliant with the statements and responsibilities set out . . . in the permanency plans." We agree with the trial court that this ground was sufficiently established.

In our opinion, the responsibilities of Mother under the permanency plans were sensibly related to addressing her suitability as a caregiver and, in a more logistical sense, the suitability of her home. Mother's history with drugs was at the forefront of the Department's concern, as Mother had tested positive for drugs prior to the Children's removal.[4] Appropriately, therefore, Mother was required to, among other things, schedule an alcohol and drug assessment and follow all recommendations, not use any illegal substances, submit to and have clean random drug screens, and provide the Department with documentation of attendance to alcohol and drug treatment appointments. Of course, as we have already alluded to, Mother did not demonstrate significant commitment to this area of concern and the corresponding responsibilities. Although it is true that the record contains evidence of certain limited occasions where Mother passed drug screens, the overwhelming balance of the proof on the matter confirms either continued drug use or efforts of Mother to avoid testing on the issue. As to this latter concern, the record reflects that Mother was a serial offender when it came to missing drug screens. Moreover, Ms. Weir testified that Mother had not completed alcohol and drug treatment.

Mother's noncompliance with the permanency plans' drug-related requirements was far from the only shortcoming exhibited by her in this case.[5] Indeed, the proof at trial clearly revealed that Mother had not complied with many of her permanency plan responsibilities. For instance, Mother was required to follow all recommendations of her mental health assessment and provide the Department with documentation of attendance to her mental health appointments, and the proof showed that Mother had been recommended to participate in family therapy and individual counseling. Mother, however, never provided any proof of participation in counseling.

Whereas Mother was required to follow the law and comply with any and all probation requirements she may have, she violated her probation in October 2019 and was subsequently incarcerated from November 12, 2019 to December 12, 2019. Regarding her transportation needs, Mother was directed to utilize public transportation such as Ethra and provide the Department with a copy of Stepfather's license, registration, and insurance. As

---

[4] The record contains evidence that Mother's drug problems actually go back much further than the time of removal. For instance, the record reveals that Mother was criminally charged in 2016 after she had been found on a sidewalk "screaming and wailing her harms." According to the affidavit of complaint pertaining to this charge, Mother admitted that she had been using methamphetamine. Moreover, according to the same affidavit, after she was placed into custody, a tablet believed to be oxycodone was found in her purse. Mother subsequently entered a plea of guilty for possession of a schedule II controlled substance.

[5] We certainly do not intend to suggest that Mother made no efforts to work her plan. Indeed, as noted earlier, Ms. Dixon spoke favorably of Mother's initial efforts following the Children's removal. Yet, Ms. Dixon noted that there was a drop-off from such positive progress after Mother failed a drug screen about two months after the Children's removal.

to these requirements, Ms. Dixon testified that she never got proof of insurance or registration. Moreover, according to a June 2020 "Affidavit of Continuing Reasonable Efforts" filed after the commencement of the termination proceeding, Mother had not provided proof of registration or insurance to the Department. Mother also expressed a refusal to use Ethra and requested "gas money" when Ms. Weir had discussed different ways she could assist Mother with transportation. Ms. Weir related her exchange with Mother over this issue as follows:

> I explained to her that we do have gas cards we can ask Fiscal to pay for. However, typically the mileage that is allotted for the gas price would be upwards of 200 miles. And I explained to her that I would ask Fiscal about the gas cards. But that she could also utilize Ethra, public transportation, in Grainger County.
>
> Her response was that it was my job to give her gas money and assistance with those things, and she repeatedly refused to use Ethra because it was against her religion.

According to Ms. Weir, Mother had never explained how using Ethra was against her religion.

Additionally, although Mother was required to have a minimum of two supervised visits per month with the Children, her visitation was testified to have been "sporadic" by more than one trial witness, so much so that it engendered negative feelings in the Children and impacted the bonding among the parties. As Ms. Weir explained:

> The children have sometimes been disappointed. What we ended up doing is we would not tell the children about the visit until the day of, until we knew it was for sure going to happen because there were so many times where [Mother] would reschedule or say [she] didn't have money. So there were efforts that the provider and I had made to ensure that the children were not let down or disappointed.

Mother's compliance with the permanency plan requirements concerning housing was also of significant concern in this case, a point that should be evident from our discussion of the previously-discussed ground for termination. Whereas Mother was required to obtain and maintain safe and stable housing, she admittedly did not do so. Again, her brief specifically acknowledges that she "does not currently have suitable housing." She also never provided rent receipts as required under the amended permanency plans. In light of the foregoing discussion, we discern no error in the trial court's conclusion that this ground for termination was clearly and convincingly established.

*Persistent Conditions*

The termination ground commonly known as "persistent conditions" or "persistence of conditions" applies when

> [t]he child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child,[6] and:
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code. Ann. § 36-1-113(g)(3)(A). "A finding on the ground of persistence of conditions is not appropriate unless DCS presents clear and convincing evidence to establish each statutory element." *In re B.A.C.*, 317 S.W.3d 718, 725 (Tenn. Ct. App. 2009). The purpose behind this ground "is to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008).

The evidence presented at trial clearly and convincingly supports this ground for termination. The Children were removed at the beginning of April 2019, and therefore, by the time of the October 2020 trial, they had not been in Mother's custody for well over six months.[7] The other elements are also sufficiently supported. In finding that the conditions that led to the Children's removal still persisted, the trial court observed that the Children had been removed due to a failed drug screen but that Mother had continued to fail drug

---

[6] Although this ground was previously only applicable if a juvenile court had adjudicated the child to be dependent and neglected, *see In re Jude M.*, 619 S.W.3d 224, 241 n.4 (Tenn. Ct. App. 2020), the current version of the statute, as noted herein, contains a threshold requirement that the ground be predicated upon an order removing the child which was "entered at any stage of proceedings in which a petition has been filed in the juvenile court *allegin*g that a child is a dependent and neglected child." Tenn. Code Ann. § 36-1-113(g)(3)(A) (emphasis added).

[7] By statute, the six months "must accrue on or before the first date the termination of parental rights petition is set to be heard." Tenn. Code Ann. § 36-1-113(g)(3)(B).

screens during the pendency of the case "by actually failing them or refusing or failing to show up and take a random drug screen." The court also referenced Mother's general lack of compliance and the Department's unsuccessful efforts to get "therapy completed." It concluded that there was "little chance" the conditions preventing the Children's return could be remedied soon, while also determining that "[c]ontinuation of the parent/child relationship greatly diminishes the children's chances of being placed into a safe, stable and permanent home." In support of this latter determination, the court observed that the "children are well bonded where they are" and that "they're thriving."

The record supports the trial court's determinations. In addition to the drug issues specifically highlighted by the trial court in connection with its discussion of this ground, we observe that the lack of appropriate housing also remains a barrier to the Children's safe return. Moreover, consistent with our discussion earlier in this Opinion, we are of the opinion that there is clear and convincing evidence that there is little likelihood that such outstanding concerns can be remedied by an early date. As for the last element under this ground regarding the continuation of the parent and child relationship, we likewise agree that a continuation of Mother and the Children's relationship greatly diminishes the Children's chances of early integration into a safe, stable, and permanent home. Given Mother's past failures to show a commitment to establishing a drug-free lifestyle and her failure to establish a suitable home, there is certainly no guarantee that she will ever be able to do so, thereby threatening early permanency for the Children if the relationship were to be continued.

*Failure to Manifest an Ability and Willingness to Personally Assume Custody or Financial Responsibility of the Children*

The last ground for termination relied upon by the trial court is codified at Tennessee Code Annotated section 36-1-113(g)(14). That statute provides that a parent's rights may be terminated when he or she

> has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). This ground for termination, which is a relatively new addition to the Tennessee Code, requires the Department to establish two elements by clear and convincing evidence. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018). The Department must first "prove that [the parent] failed to manifest 'an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren].'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)). Second, the Department "must . . . prove that placing the children

- 12 -

in [the parent's] 'legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren].'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)).

As to the first of the aforementioned prongs, the Tennessee Supreme Court has recently clarified that the statute "places a conjunctive obligation on a parent . . . to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020). Therefore, "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest <u>either</u> ability or willingness, then the first prong of the statute is satisfied." *Id.*

Of note, Mother's argument on appeal as to this ground ignores the foregoing guidance from our Supreme Court. She relies specifically on this Court's decision in *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044 (Tenn. Ct. App. May 31, 2018), arguing in relevant part as follows:

> Just as in *In re Ayden S.*, DCS did not prove, or even provide any evidence at trial, that [Mother] is not willing to assume physical and legal custody. In fact, all the evidence at trial demonstrates that [Mother] is willing to assume custody because of the progress that [Mother] has made on her permanency plan. Therefore, DCS did not prove by clear and convincing evidence that [Mother] has failed to manifest a willingness to personally assume legal and physical custody because they did not introduce any evidence at trial that [Mother] failed to manifest a willingness to assume custody.

Our Supreme Court, however, has now overruled *In re Ayden S. In re Neveah M.*, 614 S.W.3d at 662. Indeed, as alluded to above, the Supreme Court gave specific approval to another interpretation advanced by different panels of this Court, i.e., that the statute requires proof "that a parent was either unable or unwilling to personally assume legal and physical custody or financial responsibility of a child." *Id.*

Here, even assuming that the record supported the notion that Mother demonstrated a willingness to personally assume custody of the Children,[8] the record clearly supports the trial court's finding that she failed to manifest an ability to do so. As we have detailed herein, Mother's drug use has remained a point of concern throughout this case, as she has consistently failed to show up for drug screens and failed others. The record also reveals that she had not completed alcohol and drug treatment. Mother also has failed to establish a suitable home for the Children, and although she was recommended to participate in family therapy as well as individual counseling as a result of her mental health assessment, she never provided any proof that she has participated in counseling. In short, Mother's

_____

[8] The Department, of course, strongly disputes such a proposition.

- 13 -

actions in this case failed to address the concerns that have existed as to her suitability as a caregiver for the Children. These concerns still remain. Accordingly, we conclude that there is clear and convincing evidence that she has failed to manifest an ability to assume custody of the Children.

There is also clear and convincing evidence to support the trial court's conclusion that returning the Children to Mother "would pose a risk of substantial harm to their physical and psychological welfare." Aside from the concerns that exist over returning the Children to an unsuitable home and potential exposure to drugs, we note again that Terry reportedly expressed a desire to not return to Mother and Mary evidently "has pretty much said the same thing." Ms. Weir testified she was concerned that the Children would be at risk for psychological harm if they were placed with Mother, and there was specific evidence in the record that Terry's continuing relationship with Mother yielded negative behavior as the case progressed. The foster mother specifically noted that Terry had behavioral problems related to his visitations and that he would take his anger at Mother out on her or his sister. The foster mother observed, however, that Terry had been a lot better as phone calls with Mother had decreased and as visits with Mother had shortened. In light of the above discussion, we affirm the trial court's reliance on this ground for termination.

*Best Interests*

When at least one ground for termination has been properly established against a parent, we turn our focus to whether termination of the parent's parental rights is in the child's best interests. "Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 573 (Tenn. Ct. App. 2013). As such, "[w]hen at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest." *Id.* at 572.

When conducting a best interests analysis, conflicts between the interests of the parent and child are to be resolved in "favor of the rights and best interest of the child." *Id.* at 573 (citing Tenn. Code Ann. § 36-1-101(d)). Importantly, the best interests analysis "must be viewed from the child's, rather than the parent's, perspective." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). In Tennessee, the General Assembly has codified a list of nine non-exclusive factors that trial courts are to consider when conducting a best interests inquiry in termination of parental rights proceedings.[9] These

---

[9] Although not pertinent to this appeal, we observe that the best interest inquiry was recently modified by statute. *See* 2021 Tenn. Pub. Acts., ch. 190, § 1; *In re Miley D.*, No. M2020-01416-COA-R3-PT, 2021 WL 2948776, at *5 n.5 (Tenn. Ct. App. July 14, 2021) (noting that the General Assembly listed

- 14 -

factors are as follows:

> (1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "Ascertaining a child's best interests does not call for a rote examination" of these factors, and "depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878.

In considering the factors under Tennessee Code Annotated section 36-1-113(i), the trial court supported its conclusion that termination of Mother's rights was in the Children's best interests by noting, among other things, that Mother had "ongoing drug issues and housing issues," that her visitation had been "sporadic" and "at times . . . resulted in the

---

additional factors to be considered under an amended version of the best interest statute).

children . . . having some adverse reaction to having had the contact," that the Children were "well bonded with their foster parents" and thriving, and that the foster parents would like to adopt the Children. We agree with the trial court that there is clear and convincing evidence that termination is in the Children's best interests. For the reasons already discussed, Mother is in no position to assume custody of the Children. As the trial court noted, significant concerns still exist surrounding her use of drugs and her housing, and it is entirely speculative that she will be able to remedy these issues at any point in the near future. The Children are doing well with their foster family who wants to adopt them, and they reportedly do not want to return to Mother. Considering all of the above and the record as a whole from the Children's perspective, we conclude that the termination of Mother's rights was warranted and supported by clear and convincing evidence.

## CONCLUSION

For the reasons stated in this Opinion, the trial court's termination of Mother's parental rights is hereby affirmed.

s/ Arnold B. Goldin
ARNOLD B. GOLDIN, JUDGE